JOHN BARRON, SURVIVOR OF JOHN CRAIG, FOR THE USE OF
LUKE TIERNAN, EXECUTOR OF JOHN CRAIG v. THE MAYOR
AND CITY COUNCIL OF BALTIMORE.

The provision in the fifth amendment to the constitution of the United
States, declaring that private property shall not be taken for public use
without just compensation, is intended solely as a limitation on the exer-
cise of power by the government of the United States; and is not appli-
cable to the legislation of the states.

The constitution was ordained and established by the people of the United
States for themselves; for their own government; and not for the govern-
ment of individual states. Each state established a constitution for itself,
and in that constitution provided such limitations and restrictions on the
powers of its particular government as its judgment dictated. The peo-
ple of the United States framed such a government for the United States
as they supposed best adapted to their situation, and best calculated to
promote their interests. The powers they conferred on this government
were to be exercised by itself; and the limitations on power, if expressed
in general terms, are naturally and necessarily applicable to the govern-
ment created by the instrument. They are limitations of power granted
in the instrument itself; not of distinct governments framed by different
persons and for different purposes.

ON a writ of error to the court of appeals for the western shore
of the state of Maryland.

This case was instituted by the plaintiff in error against the
city of Baltimore, under its corporate title of " The Mayor and
City Council of Baltimore," to recover damages for injuries to
the wharf-property of the plaintiff, arising from the acts of the
corporation. Craig and Barron, of whom the plaintiff is sur-
vivor, were owners of an extensive and highly productive
wharf in the eastern section of Baltimore, enjoying, at the
period of their purchase of it, the deepest water in the harbour.

The city, in the asserted exercise of its corporate authority
over the harbour, the paving of streets, and regulating grades
for paving, and over the health of Baltimore, directed from their
accustomed and natural course, certain streams of water which
flow from the range of hills bordering the city, and diverted
them, partly by adopting new grades of streets, and partly by
the necessary results of paving, and partly by mounds, em-

bankments and other artificial means, purposely adapted to bend the course of the water to the wharf in question. These streams becoming very full and violent in rains, carried down with them from the hills and the soil over which they ran, large masses of sand and earth, which they deposited along, and widely in front of the wharf of the plaintiff. The alleged consequence was, that the water was rendered so shallow that it ceased to be useful for vessels of any important burthen, lost its income, and became of little or no value as a wharf.

This injury was asserted to have been inflicted by a series of ordinances of the corporation, between the years 1815 and 1821; and that the evil was progressive; and it was active and increasing even at the institution of this suit in 1822.

At the trial of the cause in Baltimore county court, the plaintiff gave evidence tending to prove the original and natural course of the streams, the various works of the corporation from time to time to turn them in the direction of this wharf, and the ruinous consequences of these measures to the interests of the plaintiff. It was not asserted by the defendants that any compensation for the injury was ever made or proffered; but they justified under the authority they deduced from the charter of the city, granted by the legislature of Maryland, and under several acts of the legislature conferring powers on the corporation in regard to the grading and paving of streets, the regulation of the harbour and its waters, and to the health of the city.

They also denied that the plaintiff had shown any cause of action in the declaration, asserting that the injury complained of was a matter of public nuisance, and not of special or individual grievance in the eye of the law. This latter ground was taken in exception, and was also urged as a reason for a motion in arrest of judgment. On all points, the decision of Baltimore county court was against the defendants, and a verdict for four thousand five hundred dollars was rendered for the plaintiff. An appeal was taken to the court of appeals, which reversed the judgment of Baltimore county court, and did not remand the case to that court for a further trial. From this judgment the defendant in the court of appeals, prosecuted a writ of error to this court.

[Barron v. The Mayor and City Council of Baltimore.]

The counsel for the plaintiff presented the following points:

The plaintiff in error will contend that apart from the legis-lative sanctions of the state of Maryland and the acts of the corporation of Baltimore, holding out special encouragement and protection to interests in wharves constructed on the shores of the Patapsco river, and particularly of the wharf erected by Craig and the plaintiff, Barron; the right and profit of wharfage, and use of the water at the wharf for the objects of naviga-tion, was a vested interest and incorporeal hereditament, invio-lable even by the state, except upon just compensation for the privation; but the act of assembly and the ordinance of the city are relied on as enforcing the claim to the undisturbed enjoy-ment of the right.

This right was interfered with, and the benefit of this pro-perty taken away from the plaintiff by the corporation, avow-edly, as the defence showed, for public use; for an object of public interest—the benefit more immediately of the commu-nity of Baltimore, the individuals, part of the population of Maryland, known by the corporate title of the Mayor and City Council of Baltimore. The "inhabitants" of Baltimore are thus incorporated by the act of 1796, ch. 68. As a corporation they are *made liable to be sued*, and authorized to sue, to acquire and hold and dispose of property, and, within the scope of the powers conferred by the charter, are allowed to pass ordinances and legislative acts, which it is declared by the charter shall have the same effect as acts of assembly, and be operative, provided they be not repugnant to the laws of the state, or the constitution of the state, or of the United States. The plaintiff will contend, accordingly:

1. That the Mayor and City Council of Baltimore, though viewed even as a municipal corporation, is liable for tort and actual misfeasance; and that it is a tort, and would be so even in the state acting in her immediate sovereignty, to deprive a citizen of his property, though for public uses, without indem-nification: that regarding the corporation as acting with the delegated power of the state, the act complained of is not the less an actionable tort.

2. That this is the case of an authority exercised under a

state; the corporation appealing to the legislative acts of Mary-land for the discretional power which it has exercised.

3. That this exercise of authority was repugnant to the constitution of the United States, contravening the fifth article of the amendments to the constitution, which declares that "private property shall not be taken for public use without just compensation;" the plaintiff contending that this article declares principles which regulate the legislation of the states, for the protection of the people in each and all of the states regarded as citizens of the United States, or as inhabitants subject to the laws of the union.

4. That under the evidence, prayers, and pleadings in the case, the constitutionality of this authority exercised under the state must have been drawn in question, and that this court has appellate jurisdiction of the point, from the judgment of the court of appeals of Maryland, the highest court of that state; that point being the essential ground of the plaintiff's pretension in opposition to the power and discretion of the corporation.

5. That this court in such appellate cognizance is not confined to the establishment of an abstract point of construction, but is empowered to pass upon the right or title of either party; and may, therefore, determine all points incidental or preliminary to the question of title, and necessarily in the course to that inquiry; that consequently the question is for this court's determination whether the declaration avers actionable matter, or whether the complaint is only of a public nuisance; and on that head the plaintiff will contend that special damage is fully shown here within the principle of the cases where an individual injury resulting from a public nuisance is deemed actionable; the wrong being merely public only so long as the loss suffered in the particular case is no more than all members of the community suffer.

Upon these views the plaintiff contends that the judgment of the court of appeals ought to be reversed.

The counsel for the plaintiff in error, Mr Mayer, on the suggestion of the court, confined the argument to the question whether, under the amendment to the constitution, the court had jurisdiction of the case.

The counsel for the defendants in error, Mr Taney and Mr Scott, were stopped by the court.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

The judgment brought up by this writ of error having been rendered by the court of a state, this tribunal can exercise no jurisdiction over it, unless it be shown to come within the provisions of the twenty-fifth section of the judicial act.

·The plaintiff in error contends that it comes within that clause in the fifth amendment to the constitution, which inhibits the taking of private property for public use, without just compensation. He insists that this amendment, being in favour of the liberty of the citizen, ought to be so construed as to restrain the legislative power of a state, as well as that of the United States. If this proposition be untrue, the court can take no jurisdiction of the cause.

The question thus presented is, we think, of great importance, but not of much difficulty.

The constitution was ordained and established by the people of the United States for themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and, in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated. The people of the United States framed such a government for the United States as they supposed best adapted to their situation, and best calculated to promote their interests. The powers they conferred on this government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally, and, we think, necessarily applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons and for different purposes.

If these propositions be correct, the fifth amendment must be understood as restraining the power of the general government, not as applicable to the states. In their several constitutions they have imposed such restrictions on their respective

governments as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively, and with which others interfere no farther than they are supposed to have a common interest.

The counsel for the plaintiff in error insists that the constitution was intended to secure the people of the several states against the undue exercise of power by their respective state governments; as well as against that which might be attempted by their general government. In support of this argument he relies on the inhibitions contained in the tenth section of the first article.

We think that section affords a strong if not a conclusive argument in support of the opinion already indicated by the court.

The preceding section contains restrictions which are obviously intended for the exclusive purpose of restraining the exercise of power by the departments of the general government. Some of them use language applicable only to congress: others are expressed in general terms. The third clause, for example, declares that "no bill of attainder or ex post facto law shall be passed." No language can be more general; yet the demonstration is complete that it applies solely to the government of the United States. In addition to the general arguments furnished by the instrument itself, some of which have been already suggested, the succeeding section, the avowed purpose of which is to restrain state legislation, contains in terms the very prohibition. It declares that "no state shall pass any bill of attainder or ex post facto law." This provision, then, of the ninth section, however comprehensive its language, contains no restriction on state legislation.

The ninth section having enumerated, in the nature of a bill of rights, the limitations intended to be imposed on the powers of the general government, the tenth proceeds to enumerate those which were to operate on the state legislatures. These restrictions are brought together in the same section, and are by express words applied to the states. "No state shall enter into any treaty," &c. Perceiving that in a constitution framed by the people of the United States for the government of all, no limitation of the action of government on

the people would apply to the state government, unless expressed in terms; the restrictions contained in the tenth section are in direct words so applied to the states.

It is worthy of remark, too, that these inhibitions generally restrain state legislation on subjects entrusted to the general government, or in which the people of all the states feel an interest.

A state is forbidden to enter into any treaty, alliance or confederation. If these compacts are with foreign nations, they interfere with the treaty making power which is conferred entirely on the general government; if with each other, for political purposes, they can scarcely fail to interfere with the general purpose and intent of the constitution. To grant letters of marque and reprisal, would lead directly to war; the power of declaring which is expressly given to congress. To coin money is also the exercise of a power conferred on congress. It would be tedious to recapitulate the several limitations on the powers of the states which are contained in this section. They will be found, generally, to restrain state legislation on subjects entrusted to the government of the union, in which the citizens of all the states are interested. In these alone were the whole people concerned. The question of their application to states is not left to construction. It is averred in positive words.

If the original constitution, in the ninth and tenth sections of the first article, draws this plain and marked line of discrimination between the limitations it imposes on the powers of the general government, and on those of the states; if in every inhibition intended to act on state power, words are employed which directly express that intent; some strong reason must be assigned for departing from this safe and judicious course in framing the amendments, before that departure can be assumed.

We search in vain for that reason.

Had the people of the several states, or any of them, required changes in their constitutions; had they required additional safeguards to liberty from the apprehended encroachments of their particular governments: the remedy was in their own hands, and would have been applied by themselves. A con-

· vention would have been assembled by the discontented state, and the required improvements would have been made by itself. The unwieldy and cumbrous machinery of procuring a recommendation from two-thirds of congress, and the assent of three-fourths of their sister states, could never have occurred to any human being as a mode of doing that which might be effected by the state itself. Had the framers of these amendments intended them to be limitations on the powers of the state governments, they would have imitated the framers of the original constitution, and have expressed that intention. Had congress engaged in the extraordinary occupation of improving the constitutions of the several states by affording the people additional protection from the exercise of power by their own governments in matters which concerned themselves alone, they would have declared this purpose in plain and intelligible language.

But it is universally understood, it is a part of the history of the day, that the great revolution which established the constitution of the United States, was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen, who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised in a manner dangerous to liberty. In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments.

In compliance with a sentiment thus generally expressed, to quiet fears thus extensively entertained, amendments were proposed by the required majority in congress, and adopted by the states. These amendments contain no expression indicating an intention to apply them to the state governments. This court cannot so apply them.

We are of opinion that the provision in the fifth amendment to the constitution, declaring that private property shall not be taken for public use without just compensation, is intended solely as a limitation on the exercise of power by the govern-

[Barron v. The Mayor and City Council of Baltimore.]

ment of the United States, and is not applicable to the legislation of the states. We are therefore of opinion that there is no repugnancy between the several acts of the general assembly of Maryland, given in evidence by the defendants at the trial of this cause, in the court of that state, and the constitution of the United States. This court, therefore, has no jurisdiction of the cause; and it is dismissed.

This cause came on to be heard on the transcript of the record from the court of appeals for the western shore of the state of Maryland, and was argued by counsel: on consideration whereof, it is the opinion of this court that there is no repugnancy between the several acts of the general assembly of Maryland, given in evidence by the defendants at the trial of this cause in the court of that state, and the constitution of the United States; whereupon, it is ordered and adjudged by this court that this writ of error be, and the same is hereby dismissed for the want of jurisdiction.